**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>**Melissa R. Simmons**</u>

     **v.**

<u>**Michael J. Astrue, Commissioner,**</u>
<u>**Social Security Administration**</u>

Case No.  09-cv-378-PB
Opinion No. 2010 DNH 161

<u>**MEMORANDUM AND ORDER**</u>

Melissa Simmons appeals from the Social Security Commissioner's denial of her application for Disability benefits. She faults the Administrative Law Judge ("ALJ") who denied her claims both for failing to find that she met the requirements of the listing for multiple sclerosis and for refusing to seek testimony from a vocational rehabilitation expert before determining that a significant number of jobs existed in the national economy that Simmons could perform in spite of her multiple sclerosis.  For the reasons set forth below, I affirm the Commissioner's decision.

## I.   BACKGROUND[1]

### A.   Procedural History

Simmons applied for DIB on November 23, 2007 claiming
disability caused by the symptoms of her multiple sclerosis.
(Tr. at 43, 91-93).  After Simmons' initial application was
denied by the Commissioner, Simmons sought an administrative
hearing.  (Tr. at 47-50, 51-55).  At the hearing, Simmons was
represented by counsel and both she and her husband testified.
(Tr. at 20-42).

On June 3, 2009 the ALJ denied Simmons' claim.  (Tr. at 12-
19).  While the ALJ found that Simmons' multiple sclerosis
constituted a severe impairment, she determined that it did not
meet or equal the criteria for multiple sclerosis identified in
Section 11.09 of the Commissioner's Listing of Impairments("the
Listing").  20 C.F.R. Part 404, Subpt. P, App. 1, § 11.09; (Tr.
at 15).  In addition, the ALJ found that while Simmons was unable
to perform her past relevant work, she nevertheless retained the
residual functional capacity ("RFC") to perform work that existed

---

[1] The background facts are presented in detail in the
parties' Joint Statement of Material Facts (Doc. No. 13) and are
summarized here.  Citations to the Administrative Record
Transcript are indicated by "Tr."

in significant numbers in the national economy.  (Tr. at 15-17).

The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Simmons' request for review on September 11, 2009.  See 20 C.F.R. §§ 404.905, 404.987(a).

**B.   Education and Work History**

Simmons was 42 years old when the ALJ denied her application on June 3, 2009.  (Tr. at 12-19).  She has a college education, and her past relevant work includes time spent as an executive assistant, a teacher's aid and an office manager.  (Tr. at 29, 113-114).  Most recently, Simmons has worked from home as a telemarketer for approximately five hours a week.  (Tr. at 26, 97-99).

**C.   Medical Evidence**

During the spring of 2006, Simmons reported numerous instances of back pain as well as tingling or numbness in her lower extremities.  (Tr. at 206, 216-18, 226, 242-43).  After multiple visits to the hospital and several different physicians, an MRI scan of Simmons' dorsal spine revealed a small enhancing

intrameduallary[2] lesion at the T3 level.  (Tr. at 256-58).  The
potential diagnosis was that of a dymelinating disorder[3]
including multiple sclerosis.  (Tr. at 256).

After her MRI, Simmons saw Dr. George Neal, a neurologist.
(Tr. at 294-95).  Dr. Neal noted his suspicion that the
abnormality noted on the MRI may indicate multiple sclerosis, but
he did not believe it met the conventional diagnostic criteria at
that point.  (Tr. at 294).  Therefore, Dr. Neal elected to defer
treatment.  (Tr. at 286).

Over the next few months Simmons attended several followup
appointments with Dr. Neal.  (Tr. at 284, 286).  Dr. Neal's
evaluations noted normal strength in Simmons' legs and no sign of
visual neuropathy[4].  (Tr. at 255, 286).  Simmons' motor bulk,
tone and strength, muscle and plantar reflexes, gait, and station
were all normal.  (Tr. at 284).  A repeat MRI scan of Simmons'

---

[2] Intramedullary, refers to an area within the spinal cord.
See Stedman's Medical Dictionary 917 (27th ed. 2000).

[3] Demyelination, refers to the loss of myelin with
preservation of the axons or fiber tracts.  Central demyelination
occurs within the central nervous system and is seen with
multiple sclerosis.  See Stedman's at 472.

[4] Neuropathy is a classical term for any disorder affecting
any segment of the nervous system.  See Stedman's at 1211.

spine on June 29, 2006 revealed the same lesion at T3 noted on the March 30 scan.  (Tr. at 253).  The lesion was stable, and no new lesions were noted.  (Tr. at 253).

On August 10,2006, in an exam with Dr. Neal, Simmons reported that her symptoms were mostly gone.  (Tr. at 281).  Dr. Neal surmised that Simmons likely had a demyelinating event, the symptoms of which were mostly resolved.  (Tr. at 281).

Three months later, Simmons visited Dr. Neal complaining of reduced energy levels, episodes of numbness, as well as instances of crying and constipation.  (Tr. at 280).  On exam, Dr. Neal noted that Simmons was awake and alert, showing no signs of impairment in cognitive function.  (Tr. at 280).  Simmons' motor bulk, tone and strength, muscle and plantar reflexes, gait, station, and sensory exam were all normal.  (Tr. at 280).  Dr. Neal suggested further MRI scans of the brain and spine.  (Tr. at 280).

On November 30, 2006, Simmons attended an exam with Dr. Maria Houtchens at the Partners Multiple Sclerosis Center.  (Tr. at 207-208).  On exam, Dr. Houtchens noted that Simmons was alert and oriented.  (Tr. at 208).  Her memory, comprehension, repetition, and naming were intact.  (Tr. at 208).  Motor

-5-

examination showed 5/5 muscle strength in muscle groups with normal muscle tone and bulk.  (Tr. at 208).

Dr. Houtchens opined that Simmons satisfied a diagnosis of clinically isolated syndrome[5] on the basis of a myelitis episode. (Tr. at 208).  She was not convinced that the later weakness and fatigue Simmons experienced was a relapse, but noted that it was possible if additional lesions were noted on a follow-up MRI. (Tr. at 208).  In addition, Dr. Houtchens was not certain Simmons had clinically definite multiple sclerosis at that point, but she determined that Simmons was a candidate for therapy due to the delayed conversion to clinically definite multiple sclerosis by patients who started treatments early.  (Tr. at 208).

On December 23, 2006, Simmons underwent another MRI scan. (Tr. at 250-52).  The scan revealed the same intramedulliary lesion on the cervical cord at the T3 level.  (Tr. at 250).  The lesion appeared unchanged from the July and March examinations.

---

[5] The term "clinically isolated syndrome" (CIS) has been used to describe a first neurologic episode that lasts at least 24 hours, and is caused by inflammation/demyelination in one or more sites in the central nervous system (CNS).  National Multiple Sclerosis Society, *Clinically Isolated Syndrome*, http://www.nationalmssociety.org/about-multiple-sclerosis/what-we -know-about-ms/diagnosing-ms/cis/index.aspx (last visited Sept. 7, 2010).

(Tr. at 250).  No additional abnormalities were noted.  (Tr. at 250-51).  An MRI of Simmons brain appeared normal.  (Tr. at 252).

On February 2, 2007 Simmons saw her primary care physician, Dr. Rosenbaum, for treatment of depressive symptoms.  (Tr. at 240).  Simmons reported sleep disturbances, mood swings and crying spells.  (Tr. at 240).  Dr. Rosenbaum prescribed Celexa[6].  (Tr. at 201).  Later that month, Simmons reported to Dr. Rosenbaum that she was feeling better with no more crying spells.  (Tr. at 239).

On May 24, 2007, Simmons was seen by Dr. Houtchens on a follow-up exam.  (Tr. at 197).  Simmons reported fatigue as well as pain and numbness in her legs.  (Tr. at 197).  As a result, Simmons expressed difficulty doing work, noting one instance where she was unable to function and get out of bed.  (Tr. at 197).  Dr. Houtchens noted a largely normal neurological exam with relatively mild physical weakness.  (Tr. at 197).  It was Dr. Houtchens' opinion that there was no primary strength deficit.  (Tr. at 197).

---

[6] Celexa is indicated for the treatment of depression.  See Physician's Desk Reference 1293 (57th ed. 2005).

On September 18, 2007, Simmons underwent a neuro-
psychological assessment by Dr. Meghan Searl.  (Tr. at 187-95).
Simmons reported problems concentrating as well as changes in her
levels of interest and motivation.  (Tr. at 187-88).  She also
described periods of social withdrawal and crying.  (Tr. at 187-
88).  Simmons noted that she smoked marijuana daily to "take the
edge off" and to relax and sleep.  (Tr. at 188).

On exam, Dr. Searl noted that Simmons mood was bright and
her affect was full.  (Tr. at 190).  She appeared alert,
attentive, and oriented.  (Tr. at 190).  According to Dr. Searl,
Simmons was not easily distracted and she did not frustrate or
fatigue easily.  (Tr. at 190).  Dr. Searl concluded that Simmons
was quite bright and Dr. Searl did not see any deficits
whatsoever other than mild weakness in sustained attention.
(Tr. at 192).  Dr. Searl recommended consultation with a
psychiatrist or neuropyschitrist to help Simmons construct a
behavioral approach to her motivational treatment.  (Tr. at
192).  In addition, Dr. Searl suggested that Simmons' daily use
of marijuana may be significantly impacting her motivation,
interest, energy levels and mood.  (Tr. at 192).

-8-

On October 3, 2007 Simmons saw Dr. Neal on a followup.  (Tr. at 266).  Simmons reported that she had been unable to work since August as a result of fatigue, reduced emotions, reduced ability to respond to stimuli and depression.  (Tr. at 266).  On exam, Simmons was alert and awake and showed no impairment in cognitive or language function.  (Tr. at 266).  Dr. Neal noted that Simmons' strength and muscle reflexes were normal and opined that Simmons had prominent fatigue and other symptoms possibly related to depression.  (Tr. at 266).

On November 28, 2007 Simmons saw Dr. Houtchens and complained of depressive periods where she could not do simple things like grocery shopping and picking up the mail.  (Tr. at 185).  Dr. Houtchens noted that the neurological exam was entirely normal.  (Tr. at 185).  He suggested a referral to Dr. Melissa Frumin for a therapy consultation regarding possible bipolar disease.  (Tr. at 185).

On December 18, 2007 Simmons saw neurologist Dr. Keith McAvoy and reported endurance related issues as well as "Novocain-type sensations" radiating from her back to her abdomen.  (Tr. at 340).  On exam, Dr. McAvoy noted that Simmons was alert and oriented and that her mental status was intact.

-9-

(Tr. at 341).  Simmons' motor strength was 5/5 throughout and her coordination was good.  (Tr. at 341).  Dr. McAvoy did not find any deficiencies on the neurological exam with respect to weakness, balance difficulties, or coordination.  (Tr. at 342). Deep tendon reflexes were 2/4 in the upper extremities and 1/4 in the lower extremities.  (Tr. at 341).  Simmons requested a rolling walker, which Dr. McAvoy provided to her.  (Tr. at 342). Dr. McAvoy suggested ongoing management with a psychiatrist or counselor.  (Tr. at 342).

On February 25, 2008, Simmons underwent a neuropsychiatric evaluation with Dr. Frumin based upon Dr. Houtchens' referral for bipolar disorder.  (Tr. at 318).  Dr. Frumin noted that Simmons' mood was happy and optimistic, and her thought process was logical and coherent.  (Tr. at 319).  In Dr. Frumin's opinion, Simmons affective disorder predated her diagnosis of multiple sclerosis and he suggested that Simmons' marijuana use may be contributing to her apathy and mood instability.  (Tr. at 319). He recommended that Simmons start a mood stabilizer and possibly an antidepressant.  (Tr. at 319).

On April 2, 2008 Simmons had a followup appointment with Dr. McAvoy.  (Tr. at 378).  Simmons reported Dr. Frumin's opinion

that she only had mild depression.  (Tr. at 378).  Simmons
expressed concern regarding Dr. Houtchens' belief that a
diagnosis of multiple sclerosis was not certain.  (Tr. at 378).
Dr. McAvoy stated his opinion that the diagnosis of multiple
sclerosis was not in question.  (Tr. at 378).

On May 8, Simmons saw Dr. Rosenbaum and complained of
fatigue and saddle anesthesia.  (Tr. at 386).  Simmons also
expressed her desire to discontinue use of her Celexa.  (Tr. at
386).  Dr. Rosenbaum disagreed with discontinuing the
antidepressant, but relented after Simmons expressed her strong
desire to due so.  (Tr. at 387).

Over the next few months, Simmons saw Dr. Rosenbaum and
reported improvement since stopping Celexa.  (Tr. at 389).  Dr.
Rosenbaum noted that she had been doing well over the past
several months and her complaints had generally been mild.  (Tr.
at 403).

On September 19, 2008 Simmons had a followup appointment
with Dr. McAvoy.  (Tr. at 368).  Simmons noted that her symptoms
had improved significantly since June.  (Tr. at 368).  On exam,
Dr. McAvoy noted that Simmons' motor strength and coordination
was good, her gait was steady, and no abnormalities in her

abdominal reflexes were noted.  (Tr. at 368).  Dr. McAvoy's
assessment was probable multiple sclerosis with possible anxiety.
(Tr. at 368-69).  Dr. McAvoy continued Simmons on Rebif[7] for the
indefinite future and ordered repeat MRI scans.  (Tr. at 369).

On January 3, 2009, Simmons underwent an MRI scan of her
brain.  (Tr. at 396-97).  The scan revealed no indication of
white matter disease and no significant changes since her
December 2007 scan.  (Tr. at 396-97).  Later that month Simmons
underwent an MRI scan of her spine.  (Tr. at 398-400).  The MRI
scan revealed no changes since her December 2007 scan.  (Tr. at
398-400).

On January 19, 2009, Simmons has a followup visit with Dr.
McAvoy.  (Tr. at 422-24).  Simmons noted that while her fatigue
had improved, she continued aching and numbness in her torso.
(Tr. at 422).  Simmons also noted trouble concentrating.  (Tr. at
422).  On exam, Dr. McAvoy observed that Simmons was alert, her
motor strength and coordination was good, her muscle tone was
normal, and her gait was steady.  (Tr. at 423).  The MRI scans

---

[7] Rebif is indicated for the treatment of patients with
relapsing forms of multiple sclerosis to decrease the frequency
of clinical exacerbations and delay the accumulation of physical
disability.  See Physician's Desk Reference at 2624.

were unchanged when compared with prior studies.  (Tr. at 423).
Dr. McAvoy continued to prescribe Rebif and neither Simmons nor
Dr. McAvoy felt that any additional medication was needed.  (Tr.
at 423).

**D.   <u>Opinion Evidence</u>**

On March 3, 2008, state agency physician Dr. Joseph Cataldo
reviewed the evidence in the record and completed a Physical RFC
assessment.  (Tr. at 345-52).  Dr. Cataldo determined that
Simmons could lift and carry twenty pounds occasionally and ten
pounds frequently, stand and walk for a total of six hours in an
eight-hour workday, sit for a total of about six hours in an
eight-hour workday, and do unlimited pushing and pulling.  (Tr.
at 346).

On March 25, 2008, state agency physician Dr. Nicholas
Kalfas reviewed the evidence in the record and completed a
Psychiatric Review Technique form.  (Tr. at 353-66).  Dr. Kalfas
opined that Simmons had a non-severe affective disorder.  (Tr. at
353, 356).  Dr. Kalfas further determined that Simmons had mild
restrictions in her activities of daily living, mild restrictions
in maintaining social functioning, and mild difficulties in
maintaining concentration, persistence, or pace.  (Tr. at 363).

**E.**   **Function Reports**

In an undated Disability Report submitted to the
Commissioner, Simmons noted that multiple sclerosis, fatigue,
depression, cognitive dysfunction, weakness, and pain
limited her ability to work.  (Tr. at 112).  She stated that
fatigue was her greatest challenge, preventing her from doing
more than meeting her own basic needs.  (Tr. at 112).  Simmons
also reported that she often was unable to focus on a
conversation, retain details, or organize information.  (Tr. at
112).

In a Function Report dated February 2, 2008, Simmons wrote
that her daily activities on a "bad day" included barely eating,
taking her medications, and showering.  (Tr. at 144).  Her
activities on a "good day" included making meals for herself and
her spouse, resting, checking e-mails, paying household bills,
doing light chores, working, showering, doing laundry, watching
television, and using the internet.  (Tr. at 153).  Simmons
reported using a cane or a rolling walker when walking a long
distance.  (Tr. at 154).

**F.   Hearing Testimony**

At the administrative hearing on March 26, 2009, Simmons stated that her multiple sclerosis had caused basic tasks, such as handling paperwork, writing, and using the computer, to become challenging.  (Tr. at 26-28).  Simmons indicated that on an everyday basis, she is able to do some chores such as laundry, though not as many loads as she would like.  (Tr. at 32).  Her daily activities include eating and taking care of herself, cooking meals, keeping up on laundry, and raking in nice weather. (Tr. at 32-33).  She is able to move around, but needs to rest after walking or being active.  (Tr. at 33).

Simmons also noted trouble dealing with stimulation.  (Tr. 33-34).  She drove herself to the hearing, which took 45 minutes, but otherwise does not drive often.  (Tr. at 34).  Simmons noted that she currently does not have a lot of pain.  (Tr. at 32).

Simmons' husband also testified at the hearing, stating that since developing multiple sclerosis, Simmons has had trouble getting up the stairs and carrying on a conversation with more than two people.  (Tr. at 39).  He noticed a dramatic change from the past, when she worked hard and was very busy.  (Tr. at 39-40).

-15-

G.   **ALJ's Decision**

In her June 3, 2009 decision, the ALJ followed the five-step sequential evaluation process established by the Commissioner for determining whether a claimant is disabled.  See 20 C.F.R. § 404.1520 (2009).  At step one, the ALJ found that Simmons had not engaged in substantial gainful activity since her alleged onset date of September 15, 2005.  See 20 C.F.R. § 404.1520(a)(4)(i); (Tr. at 14).  At step two, the ALJ found that Simmons' multiple sclerosis constituted a severe impairment.  See 20 C.F.R. § 404.1520(a)(4)(ii); (Tr. at 14-15).  At step three, the ALJ found that Simmons' multiple sclerosis did not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. See 20 C.F.R. § 404.1520(a)(4)(iii); (Tr. at 15).  The ALJ then determined that Simmons retained the RFC to perform substantially the full range of sedentary work, with the exception that she should avoid excessive heat.  See 20 C.F.R. § 404.1520(e); (Tr. at 15-17).  At step four, the ALJ found that Simmons could not perform any of her past relevant work.  See 20 C.F.R. § 404.1520(a)(4)(iv); (Tr. at 17).  At step five, the ALJ relied on section 201.28 of the Commissioner's Medical Vocational Guidelines ("the Grid") in determining that a significant number

-16-

of jobs existed in the national economy that Simmons could
perform in spite of her multiple sclerosis.  See 20 C.F.R. §
404.1520(a)(4)(v); (Tr. at 17-18).

    The Appeals Council ultimately denied review.  Thus, the
ALJ's decision became the Commissioner's final decision.  See 20
C.F.R. §§ 404.905, 404.987(a).

## II.  <u>STANDARD OF REVIEW</u>

    An individual seeking social security benefits has a right
to judicial review of a decision denying her application.  See 42
U.S.C. § 405(g).  I am empowered to affirm, modify, reverse or
remand the decision of the Commissioner based upon the pleadings
submitted by the parties and the transcript of the administrative
record.  See <u>id.</u>  However, my review is limited to determining
whether the ALJ used the proper legal standards and found facts
based on the proper quantum of evidence.  See <u>Ward v. Comm'r of
Soc. Sec.</u>, 211 F.3d 652, 655 (1st Cir. 2000).

    The factual findings of the Commissioner are conclusive if
they are supported by "substantial evidence."  See <u>id.</u>
Substantial evidence is evidence which a "reasonable mind,
reviewing the evidence in the record as a whole, could accept

. . . as adequate to support [the] conclusion." <u>Rodriguez v.</u>
<u>Sec'y of Health & Human Servs.</u>, 647 F.2d 218, 222 (1st Cir.
1981).  I do not have to agree with the Commissioner's judgment,
instead my review is limited to a determination of whether the
ALJ's decision is supported by substantial evidence.  <u>See</u> <u>Irlanda</u>
<u>Ortiz v. Sec'y of Health & Human Servs.</u>, 955 F.2d 765, 770 (1st
Cir. 1991).

    In addition, it is "the responsibility of the [ALJ] to
determine issues of credibility and to draw inferences from the
record evidence."  <u>Id.</u> at 769.  It is the role of the ALJ, and
not the role of this court, to resolve conflicts in the evidence.
<u>Id.</u>


### III.  <u>ANALYSIS</u>

    Simmons challenges the ALJ's decision at step 3 that her
disability did not meet the criteria for multiple sclerosis
contained in Listing 11.09 (C).  In addition, Simmons contends
that the ALJ erred at step 5 by relying solely on the Grid, and
instead should have obtained the testimony of a vocational
expert.  I address each argument in turn.

**A.     The ALJ's Listing Determination**

At step three in the five-step sequential process, an ALJ determines whether a claimant's severe impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  See 20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant's impairment meets the pertinent listing, then that individual is found to be "disabled."  See id.  Listing 11.09 deals specifically with multiple sclerosis.  See 20 C.F.R. Part 404, Subpt. P, App. 1, § 11.09.  Listing 11.09(C), upon which the Simmons relies, requires that a claimant with multiple sclerosis suffer from "[s]ignificant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process." See 20 C.F.R. Part 404, Subpt. P, App. 1, § 11.09(C).

Simmons faults the ALJ's determination at step 3 because it fails to consider Dr. McAvoy's finding that her deep tendon reflexes were 2/4 and 1/4 in the upper and lower extremities respectively.  (See Tr. at 341).  Simmons contends that this test, considered with her multiple sclerosis, effectively

-19-

demonstrated the significant fatigue of motor function or substantial muscle weakness required by the Listing.

There is nothing in the record to suggest, however, that either the deep tendon reflex test or the overall exam established a deficiency in muscle strength or motor function. (See Tr. at 341).  During the same exam, Dr. McAvoy noted that Simmons' motor strength was 5/5 throughout and her neurological exam did not reveal any problems with respect to weakness, balance difficulties, or coordination.  (Tr. at 341-42). Therefore, in the context of this particular exam, the ALJ reasonably could have concluded that the deep tendon reflex test standing alone was not sufficient to indicate "substantial muscle weakness" or "significant muscle fatigue."  See 20 C.F.R. Part 404, Subpt. P, App. 1, § 11.09 (C);(Tr. at 341-42).

Moreover, even if Dr. McAvoy's exam did indicate a potential deficiency, his exam by itself does not demonstrate the "reproducible" fatigue of motor function required by the listing. See 20 C.F.R. Part 404, Subpt. P, App. 1, § 11.09(C).  In the remaining evaluations conducted by Simmons' treating physicians, Simmons consistently exhibited normal energy level, awareness, strength, muscle tone, reflexes, gait, etc.  (See Tr. at 185,

208, 280, 284, 286, 294, 300, 341, 368, 423).  Therefore, the ALJ's determination that Simmons' multiple sclerosis did not meet Listing 11.09 (C) is supported by substantial evidence.  <u>See</u> <u>Ward</u>, 211 F.3d at 655; <u>Irlanda Ortiz</u>, 955 F.2d at 769.

**B.   The ALJ's Reliance on the Grid**

At step five, the burden shifts to the ALJ to prove that the claimant can make an adjustment to other work that exists in significant numbers in the national economy.  <u>See</u> 20 C.F.R. § 404.1520(a)(4)(v).  In making this determination, the ALJ must consider the claimant's RFC, age, education and work experience. <u>Id.</u>  The Grid is designed to streamline the Commissioner's burden of proving the existence of other jobs in the economy that the claimant can perform without requiring the use of a vocational expert.  <u>Ortiz v. Sec'y of Health & Human Servs.</u>, 890 F.2d 520, 524 (1st Cir. 1989).  If a claimant, based upon his or her RFC, can perform all or substantially all of the exertional demands at a given level of exertion, the Grid directs a finding of "not disabled."[8]  <u>See</u> 20 C.F.R. § 404.1520(a)(4)(v).

_____

[8] Because the Grid is based on a claimant's exertional capacities, it "can only be applied when claimant's non-exertional limitations do not significantly impair claimant's ability to perform at a given exertional level."  <u>Rose v.</u>

In this case, the ALJ determined that Simmons retained the ability to perform the full range of sedentary work with the exception that she should avoid excessive heat.  (Tr. at 15). Based on this RFC and Simmons' age (42), education (high school graduate) and work experience (skilled, semi-skilled and not transferrable), Medical Vocational Rule 201.28 of the Grid directed a finding of "not disabled."  <u>See</u> 20 C.F.R. Part 404, Subpart P, App. 2, § 201.00; (Tr. at 18).

In the present case, the ALJ concluded that he could rely on the Grid rather than a vocational expert to determine that Simmons was not disabled because Simmons' RFC permitted her to perform the full range of sedentary activity without restriction and she otherwise met the age, education, and work experience

_____

<u>Shalala</u>, 34 F.3d 13, 19 (1st Cir. 1994).  Simmons does suffer from certain nonexertional limitations including fatigue, depression, and lack of concentration.  However, as Simmons has not specifically raised these as a basis for her challenge of the ALJ's decision, they are not addressed here. <u>See</u> <u>Stoll v. Principi</u>, 449 F.3d 263, 267 (1st Cir. 2006)(claim not raised is abandoned).  In any event, sufficient evidence exists in the record to support a finding that Simmons' complaints regarding the severity of her fatigue, depression and other nonexertional limitations were not entirely credible and therefore not significant enough to preclude reliance on the Grid.  <u>See</u> <u>Ortiz</u>, 890 F.2d at 524; <u>Frustaglia v. Sec'y of Health & Human Servs.</u>, 829 F.2d 192, 195 (1st Cir. 1987); (Tr. at 192, 363).

requirements for the use of the Grid.  Simmons challenges the ALJ's decision to rely on the Grid because she contends that the decision was based on the incorrect premise that she can perform the full range of sedentary work.  In support of this argument, Simmons claims that the ALJ failed to properly consider: the waxing and waning nature of multiple sclerosis, the treatment records of Dr. Houtchens and Dr. McAvoy, and her own statements at the hearing.

### 1.   **Consideration of the Waxing and Waning Nature of MS**

First, Simmons argues that the ALJ failed to take into account the waxing and waning nature of multiple sclerosis. Simmons' complaints to her treating physicians regarding the severity of her symptoms have often varied.  (See Tr. at 280, 281, 284, 286, 294).  During certain periods, Simmons has reported little to no symptomatic effects.  (See Tr. at 281, 286 389, 403).  However, during periods of exacerbation Simmons has complained of fatigue, numbness and difficulty concentrating. (See Tr. at 197, 284, 294-95).  In her Function Report, Simmons highlighted a sharp dichotomy between "good days" and "bad days." (Tr. at 144-45).  Simmons stated that her daily activities on bad days were limited to barely eating, taking her medications and

showering, however on good days her activities included checking email, paying bills, and doing light chores around the house. (Tr. at 144-45).

While the ALJ did not specifically address the waxing and waning nature of multiple sclerosis in her decision, the ALJ did evaluate the severity of Simmons' ailments and restrictions as they were experienced during periods of exacerbation.  (See Tr. at 15-16).  In doing so, the ALJ determined that Simmons' statements regarding the intensity and limiting effects of her symptoms were not credible.  (Tr. at 16).

As noted above, the ALJ's credibility determination is entitled to deference, especially when supported by specific evidence.  See Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987) ("[t]he credibility determination by the ALJ, who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings").  In evaluating the severity of a claimant's alleged symptoms, the ALJ must first determine the presence of a medically determinable impairment that could reasonably be expected to produce the alleged symptoms.  See 20 C.F.R. §

404.1529(b).  Once an impairment is established, the ALJ will consider all available evidence including objective medical evidence, the opinions of a claimant's treating or nontreating sources, and statements by the claimant regarding their symptoms. See 20 C.F.R. § 404.1529(c)(1)-(3).  The ALJ will also consider any inconsistencies in the record and "any conflicts between [the claimant's] statements and the rest of the evidence . . . including [the] laboratory findings, and statements by [the claimant's] treating, or nontreating sources."  20 C.F.R. § 404.1529(c)(4).

In Simmons' case, the ALJ determined that multiple sclerosis could reasonably be expected to produce her fatigue and other symptoms.  (Tr. at 15).  The ALJ then discounted Simmons' complaints because she determined that Simmons' symptoms were not consistent with evidence in the record.  (Tr. at 15-16).

Simmons has consistently noted fatigue as her primary ailment.  (See Tr. at 150-55, 191, 197, 273, 284, 381).  In addition, Simmons has complained of episodes of numbness, depression and difficulty concentrating.  (See Tr. at 191, 197, 207, 216, 284).  However, the various evaluations done by Simmons' treating physicians after the discovery of the

-25-

intrameduallary lesion have consistently failed to corroborate her claims of fatigue and weakness or indicate further exacerbation of the disease.  (Tr. at 16, 185, 191, 197, 208, 280, 284, 286, 294, 300, 341, 368, 423).

The majority of the physical and neurological exams that have been conducted have indicated normal functionality.  (Tr. at 16, 185, 192, 197, 208, 280, 284, 286, 294, 300, 341, 368, 423). In the physical evaluations conducted by Simmons' treating physicians she has consistently exhibited normal energy level, awareness, strength, muscle tone, reflexes, gait, etc.  (Tr. at 185, 208, 280, 284, 286, 294, 300, 341, 368, 423).  In addition, the neuropsychological and neuropsychiatric exams have noted a euthymic mood with Simmons appearing attentive and oriented. (Tr. at 192, 318-19).  In the exam conducted by Dr. Searl, Dr. Searl noted that Simmons was note easily distracted and Dr. Searl "did not see any deficits whatsoever."  (Tr. at 192).

In addition, the subjective evidence was not entirely consistent with Simmons' allegations.  See 20 C.F.R. § 404.1529 (c)(3); (Tr. at 17).  In particular, the ALJ recounted Simmons' testimony that she does not experience a lot of pain and that she is able to perform a variety of household chores such as laundry

and driving to errands and appointments.  (See Tr. at 17).

Finally, the opinion of the non-treating state agency medical consultants do not corroborate the severity of Simmons' alleged symptoms.  (See Tr. at 17).  After reviewing Simmons' medical records and other evidence, it was the opinion of the state agency medical consultant who conducted the Physical RFC assessment that Simmons could perform the full range of light work.  (Tr. at 345-52).  In addition, the state agency physician who conducted the Psychiatric Review opined that Simmons has a non-severe affective disorder with only mild restrictions in daily living, maintaining concentration, persistence or pace. (Tr. at 353-63).

Based on Simmons' treating physicians' notes, the objective medical evidence, the subjective evidence and the state agency medical consultants' opinions, substantial evidence in the record supports the ALJ's determination that the alleged intensity and severity of Simmons' fatigue and other symptoms during periods of exacerbation was not entirely credible.  (See Tr. at 16-17).  As such, the ALJ was justified in her determination that Simmons' fatigue and other non-exertional symptoms do not impose significant limitations on the range of work Simmons is

exertionally able to perform.  See Ortiz, 890 F.2d at 524.
Therefore her reliance on the Grid was appropriate.

    2.  **Treating Physicians' Opinions**

    In addition, Simmons claims that the ALJ failed to give
weight to the opinions of Dr. Houtchens and Dr. McAvoy.  In
making a disability determination, an ALJ must consider medical
opinions in the case record.  See 20 C.F.R. § 404.1527(b).  In
evaluating various medical opinions, the ALJ will generally give
greater weight to treating physicians, as these sources provide a
more detailed and longitudinal picture than individual or
consultive examinations.  See 20 C.F.R. § 404.1527 (d)(1)-(2).

    In this case, both Dr. Houtchens and Dr. McAvoy are treating
physicians.  Therefore, their opinions are customarily given
significant weight in the ALJ's determination.  See id.  However,
contrary to Simmons' complaint, the ALJ's decision reveals
consideration of each physician's opinion.  (See Tr. at 16-17).
Her conclusion that Simmons suffered from multiple sclerosis, and
the determination that the impairment was severe was based on the
evaluations of her treating physicians including Dr. McAvoy and
Dr. Houtchens.  (See Tr. at 14).  Indeed, this determination was
likely based specifically on the opinion of Dr. McAvoy, who

provided the most certain diagnosis of multiple sclerosis.  (<u>See</u>
Tr. at 378).  In contrast, Dr. Houtchens remained uncertain of a
diagnosis of clinically definite multiple sclerosis.  (<u>See</u> Tr. at
208, 378).

By the same token, the evaluations of both Dr. Houtchens and
Dr. McAvoy were also considered by the ALJ in her determination
that the severity of Simmons' purported symptoms were not
entirely credible.  (<u>See</u> Tr. at 16, 185, 197, 207-08, 340-42,
368). As noted above, each physician's evaluations of Simmons
consistently noted normal physical and neurological exams.  (<u>See</u>
Tr. at 16, 185, 197, 207-08, 340-42, 368). On several independent
exams, both doctors noted that Simmons exhibited normal muscle
tone, alertness and orientation. (<u>See</u> Tr. at 185, 208, 341).  As
discussed above, the ALJ weighed these examinations and
determined that Simmons' statements regarding the severity of the
symptoms were not credible.  (<u>See</u> Tr. at 16).  Therefore, the ALJ
considered Dr. Houtchens' and McAvoy's exams and opinions, and
made a determination that based on these exams, and not in spite
of them, Simmons' alleged symptoms were not entirely credible.
(<u>See</u> Tr. at 15-17).  The ALJ did not err in failing to give
sufficient weight to these treating source opinions.  <u>See</u> 20

C.F.R. § 404.1527 (d); (Tr. at 15-17).

###    3.   **Simmons' Testimony & Credibility**

Finally, Simmons contends that the ALJ "misapprehended" her testimony regarding her pain and her ability to perform household chores.  In support of her contention, Simmons points to additional testimony from the administrative hearing where she explained how fatigue and other symptoms limit her daily activities.  (See Tr. at 32-35).

As previously noted, credibility determinations are made by the ALJ and are ordinarily entitled to deference when supported by specific evidence.  See Frustaglia, 829 F.2d at 195.  In evaluating Simmons symptoms, the ALJ considered all available evidence in accordance with the applicable regulations.  See 20 C.F.R. § 404.1529(c)(1)-(4); (Tr. at 15-17).  As noted above, there was substantial evidence based upon Simmons' medical records, her treating physicians exams and opinions, the non-treating state agency physicians and Simmons' own subjective evidence to support the ALJ's credibility determination.  See 20 C.F.R. § 404.1529(c)(1)-(4); (Tr. at 15-17).  As such, the ALJ's determination that the alleged severity of Simmons' symptoms and testimony were not sufficiently credible is entitled to

deference.  See Frustaglia, 829 F.2d at 195.

### IV.  **CONCLUSION**

The ALJ's decision is supported by substantial evidence in the record.  Therefore, the court is without the authority to overturn it.  The motion for order affirming the decision of the Commissioner (Doc. No. 12) is granted, and the plaintiff's motion for order reversing the decision of the Commissioner (Doc. No 11) is denied.  Accordingly, the clerk shall enter judgment and close the case.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

September 8, 2010

cc:  John A. Wolkowski, Esq.
     T. David Plourde, AUSA